# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| JIVE COMMERCE, LLC D/B/A VINO GROTTO, a Utah limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>WINE RACKS AMERICA, INC. D/B/A PREMIER WINE CELLARS, a Utah corporation; and JEFFREY OGZEWALLA, an individual,<br><br>Defendants. | MEMORANDUM DECISION AND ORDER DENYING PLAINTIFF'S VERIFIED MOTION FOR PRELIMINARY INJUNCTION<br><br><br>Case No. 1:18-CV-49 TS-BCW<br><br>District Judge Ted Stewart |

This matter is before the Court on Plaintiff's Verified Motion for Preliminary Injunction. After reviewing the materials, the Court has concluded that a hearing on the Motion is not necessary. For the reasons discussed below, the Court will deny the Motion.

## I. BACKGROUND

Plaintiff JIVE Commerce, LLC d/b/a Vino Grotto ("Plaintiff" or "Vino Grotto") and Defendant Wine Racks America, Inc. ("WRA") d/b/a Premier Wine Cellars ("Premier") are competitors in the wine rack and wine cellar industry. Plaintiff's principal, Jason Miller, was formerly employed by WRA. After a falling out with WRA's owner, Defendant Jeffery Ogzewalla, Mr. Miller founded Vino Grotto.

Plaintiff alleges that Defendants have taken a variety of actions to harm its business. Specifically, Plaintiff alleges that Defendants have used Plaintiff's Vino Grotto and Home Collector Series marks in cost-per-click advertisements on Google and other search engines to redirect consumers to Defendants' websites. Plaintiff further alleges that Defendants have

created a website that copies content, images, trade dress, and look and feel from Plaintiff's website.  Plaintiff also alleges that Defendants have contacted Plaintiff's vendors in an attempt to persuade those vendors not to work with Plaintiff and, in the course of so doing, have made defamatory comments about Plaintiff and its principal, Mr. Miller.  In addition, Plaintiff asserts that Defendants have posted false and deceptive positive reviews on the Internet, which Plaintiff contends was done to increase Defendants' market share and dilute the effect of negative reviews.  Plaintiff also claims that Defendants have forged photographs and address information on their website to create the illusion of legitimacy and to hide the geographic origin of their goods.

Plaintiff brings a variety of claims, including claims for unfair competition under the Lanham Act, common law unfair competition, unfair competition under Utah law, trade libel, defamation, common law trademark infringement, false advertising in violation of the Lanham Act, a claim for corrective advertising damages, and tortious interference with economic relations.[1]  Plaintiff now seeks a preliminary injunction.

## II.  DISCUSSION

To obtain a preliminary injunction, the moving party must demonstrate: "(1) a likelihood of success on the merits; (2) a likelihood that the movant will suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the movant's favor; and (4)

---

[1] Plaintiff has agreed to the dismissal of its Eleventh Cause of Action.  *See* Docket No. 41.

that the injunction is in the public interest."[2]  "A preliminary injunction is an extraordinary

remedy; it is the exception rather than the rule."[3]

A.      LIKELIHOOD OF SUCCESS ON THE MERITS

Plaintiff argues that it has shown a likelihood of success on the following claims: Lanham

Act unfair competition, Utah Unfair Competition Act, tortious interference with economic

relations, and common law trademark infringement.  The Court will discuss each claim in turn.

*1.      Unfair Competition*

*a.      False Advertising*

Plaintiff seeks injunctive relief under its Lanham Act claim for unfair competition

(Section 43 of the Lanham Act, 15 U.S.C. § 1125(a)).  Section 43 of the Lanham Act provides:

> Any person who, on or in connection with any goods or services . . . uses in
> commerce any . . . false or misleading description of fact, or false or misleading
> representation of fact, which--
> . . .
> (B) in commercial advertising or promotion, misrepresents the nature,
> characteristics, qualities, or geographic origin of his or her or another person's
> goods, services, or commercial activities,
> shall be liable in a civil action by any person who believes that he or she is or is
> likely to be damaged by such act.[4]

In order to prevail on a false advertising claim under § 43 of the Lanham Act, Plaintiff

must demonstrate: "(1) that defendant made material false or misleading representations of fact

in connection with the commercial advertising or promotion of its product; (2) in commerce; (3)

that are either likely to cause confusion or mistake as to (a) the origin, association or approval of

---

[2] *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1208 (10th Cir. 2009).

[3] *GTE Corp. v. Williams*, 731 F.2d 676, 678 (10th Cir. 1984).

[4] 15 U.S.C. § 1125(a)(1).

the product with or by another, or (b) the characteristics of the goods or services; and (4) injure the plaintiff."[5]

Plaintiff complains that Defendants have: (1) posted numerous forged reviews of their brand and products online; (2) marketed their products using Plaintiff's marks; (3) misrepresented the geographic origin of their goods; (4) attempted to bribe vendors to keep Plaintiff out of the market and threatened to cut off business with vendors who do business with Plaintiff; and (5) copied images, text, look-and-feel, and descriptions from Plaintiff's website. Plaintiff's second and fourth claims are addressed in relation to Plaintiff's trademark infringement and tortious interference claims. Thus, the Court turns to Plaintiff's complaints related to the alleged forged reviews, misrepresentation of geographic origin, and copied website.

*i.    Consumer Reviews*

The alleged forged reviews take two forms. The first type of reviews are reviews from Defendants' employees that are complimentary of Defendants and its products. Plaintiff has provided evidence demonstrating that Defendants' employees have left various online reviews. Plaintiff contends that these reviews contain false representations. However, as will be discussed, the Court has no information that would suggest the reviews are actionable under the Lanham Act.

Plaintiff provided a review from Jeremy Lesher, a WRA employee, which states that he was looking for a wine rack that would fit under his kitchen counter and that he "found the 24

---

[5] *Cottrell, Ltd. v. Biotrol Int'l, Inc.*, 191 F.3d 1248, 1252 (10th Cir. 1999) (internal citations omitted).

bottle table top wine rack fit neatly in that space, arrived quickly, and was very sturdy."[6]

Plaintiff has provided no information to suggest that this statement is untrue. Even if he is a

WRA employee, Mr. Lesher very well could have obtained a wine rack from WRA that fit his

specific needs and was of high quality. Other reviews contain no substantive statements or

simply indicate that WRA is a "great" company that provides "great" wine racks and "top quality

products." Such statements constitute sales puffery and are not actionable under the Lanham

Act.[7] The only statements of fact contained in these reviews is that WRA is a Utah company and

that the racks it sells are made in the United States. Based upon the information provided to the

Court, both statements appear to be true.

The second type of reviews are reviews for WRA that have been changed into reviews

for Premier, which is a d/b/a of WRA. Plaintiff has not demonstrated any false statements in

these reviews, but complains they are deceptive because they were originally written about one

company (WRA) and now appear to be written for another (Premier). However, WRA is doing

business as Premier. In all actuality, the two companies are one and the same. Thus, it seems to

make no difference who the review was initially written for. Moreover, Plaintiff has failed to

demonstrate any injury as a result of these reviews. For example, there is no evidence that a

particular customer chose to purchase Defendants' products over Plaintiff's based on the

existence of these altered reviews. Plaintiff alleges, generally, that Defendants have used these

---

[6] Docket No. 9 Ex. J.

[7] *Intermountain Stroke Ctr., Inc. v. Intermountain Health Care, Inc.*, 638 F. App'x 778, 789 (10th Cir. 2016) (holding that a company's "general declarations concerning best practices and high-quality care to be merely sales puffery that cannot form the basis of a Lanham Act claim").

reviews to increase its market share at Plaintiff's expense and to dilute the effect of legitimate

negative reviews.  However, there is no evidence to support this allegation.

*ii.*　　*Geographic Origin*

Plaintiff also argues that Defendants have made false statements concerning the

geographic origin of their goods and services.  On Premier's website, Defendants list Premiere's

mailing address as being in Bend, Oregon.  Defendants also list a Utah address for returns.  In

the "About Us" section of the website, Defendants display a picture of a building.  The building

is one that is owned by Defendant Ogzewalla and is located in Utah, not Bend, Oregon.  The

actual building has signage stating "Wine Racks America."  However, on the Premier website,

the image of the building has been altered, changing the signage from "Wine Racks America" to

"Premier Wine Cellars."  Plaintiff argues that Defendants are falsely representing that they are an

Oregon company doing business out of Bend.

In response, Mr. Ogzewalla represents that he maintains an office and employees at the

Oregon address listed on Premier's website.  He further states that he owns the building pictured

on Premier's website and changed the signage on Premier's website because Premier is a d/b/a of

Wine Racks America.

Based upon the evidence presented, the Court finds that Plaintiff has failed to

demonstrate a likelihood of success on the merits of its false designation of origin claim.

Defendants are not attempting to convince consumers that their products are made in Oregon

when they actually come from Utah.  Rather, Defendants have a presence in both states, with

WRA being operated in Utah and its d/b/a Premier operating in Oregon and partially Utah.

While there is no building in Oregon, as depicted on the Premier website, which is potentially deceiving, Plaintiff has failed to demonstrate any injury as a result of the altered image.

### iii.    Copied Website

Finally, Plaintiff complains that Defendants have copied images, text, and the overall look-and-feel from Plaintiff's website.  In response, Defendants argue that any similarity between the website is because Plaintiff copied its content from Defendants.

Neither party has provided the Court with the information necessary to resolve this dispute.  Plaintiff provides screenshots of both websites, but there is no information from which the Court can determine which website had what content first.  Moreover, with minimal exceptions, the websites are not substantially similar.  The similarities that do exist between the websites are to be expected from companies that sell similar products and market them in similar ways.  Thus, Plaintiff has failed to demonstrate a likelihood of success as to the websites generally.  As to the one picture identified as being on both websites (a cellar design), Defendants state that they have not used that image since 2015.[8]  Thus, even assuming Plaintiff had demonstrated a likelihood of success on the merits of this claim, there is no need for injunctive relief.

### b.    Trademark Infringement

"Trademark infringement is a type of unfair competition."[9]  To prevail on its claim, Plaintiff must show: (1) that its mark is protectable; (2) that Defendant used the trademark "in

---

[8] Docket No. 38 Ex. 1 ¶ 72.

[9] *Utah Lighthouse Ministry v. Found. for Apologetic Info. & Research*, 527 F.3d 1045, 1050 (10th Cir. 2008).

connection with any goods or services";[10] and (3) that Defendants' use "is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person."[11]

<em>i.</em>   <em>Protectable Interest</em>

Here, Plaintiff argues that its Vino Grotto and Home Collector Series marks are protectable. Plaintiff does not allege that it has registered these marks. Therefore, Plaintiff has the burden to demonstrate they are protectable.[12] "To be protectable, 'a mark must be capable of distinguishing the products [or services] it marks from those of others.'"[13] "There are five different categories of terms with respect to the protection of a mark: generic, descriptive, suggestive, arbitrary, and fanciful."[14]

> A mark is generic if it is a common description of products and refers to the genus of which the particular product is a species. A mark is descriptive if it describes the product's features, qualities, or ingredients in ordinary language or describes the use to which the product is put. A mark is suggestive if it merely suggests the features of the product, requiring the purchaser to use imagination, thought, and perception to reach a conclusion as to the nature of the goods. An arbitrary mark applies a common word in an unfamiliar way. A fanciful mark is not a real word at all, but is invented for its use as a mark.[15]

---

[10] 15 U.S.C. § 1125(a)(1).

[11] *Id.* § 1125(a)(1)(A).

[12] *Donchez v. Coors Brewing Co.*, 392 F.3d 1211, 1216 (10th Cir. 2004).

[13] *Id.* (quoting *Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc.*, 192 F.3d 337, 344 (2d Cir. 1999)).

[14] *Id.* (quoting *Lane Capital Mgmt., Inc.*, 192 F.3d at 334).

[15] *Lane Capital Mgmt., Inc.*, 192 F.3d at 344.

If a term is generic, it is ineligible for protection.[16]  "A descriptive mark may be eligible for protection, but only if it has acquired a 'secondary meaning' in the minds of the public."[17] "Fanciful (made-up words expressly coined to serve as trade or service marks), arbitrary (common words applied in unfamiliar ways), and suggestive marks (words that connote, rather than describe, some quality or characteristic of a product or service) are inherently distinctive, and thus receive the greatest protection against infringement."[18]

Plaintiff presents no evidence or argument as to which category its marks fall under other than a brief statement in a footnote that its marks are not generic or descriptive.[19]  Using the definitions set forth above, the Court concludes that Plaintiff's marks are either descriptive or suggestive.  "The determination whether a mark is descriptive or suggestive is difficult, and we have endorsed a helpful test for distinguishing between the two categories: suggestive terms 'require the buyer to use thought, imagination, or perception to connect the mark with the goods,' whereas descriptive terms '*directly convey* to the buyer the ingredients, qualities, or characteristics of the product.'"[20]

With this distinction, it appears that Vino Grotto is suggestive.  Vino is a word for wine and grotto is a word for cave or cavern.  A buyer would have to use thought, imagination, or perception to connect this phrase with wine cellars or wine racks.  Thus, Vino Grotto is subject

---

[16] *Donchez*, 392 F.3d at 1216.

[17] *Id.* (quotation marks omitted).

[18] *Id.* (quotation marks omitted).

[19] Docket No. 13, at 23 n.2 ("Neither of these marks are generic, descriptive or geographically descriptive.").

[20] *Hornady Mfg. Co., Inc. v. Doubletap, Inc.*, 746 F.3d 995, 1007 (10th Cir. 2014) (quoting *Water Pik, Inc. v. Med-Sys., Inc.,* 726 F.3d 1136, 1152–53 (10th Cir. 2013)).

to protection. Home Collector Series, however, is merely descriptive. It directly conveys to the buyer the qualities and characteristics of the product: a series of racks designed for home collectors of wine. As a result, it is only subject to protection if it has taken on secondary meaning.

"Secondary meaning exists only if most consumers have come to think of the word as not descriptive at all but as the name of the product [or service]."[21] Plaintiff may "establish secondary meaning . . . by presenting circumstantial evidence regarding: (1) the length and manner of its use, (2) the nature and extent of advertising and promotion of the mark and (3) the efforts made in the direction of promoting a conscious connection, in the public's mind, between the name or mark and a particular product or venture."[22]

Here, Plaintiff alleges that its marks have established secondary meaning "given the nature and extent of advertising as well as member and public recognition."[23] However, there is no evidence to support this allegation. Without such evidence, Plaintiff has failed to demonstrate, at this juncture, that its Home Collector Series is protectable.

### ii. Likelihood of Confusion

Assuming both marks are protectable and Defendants are using them in commerce, Plaintiff must demonstrate that there is a likelihood of confusion. The Tenth Circuit has identified six nonexhaustive factors to consider whether there is a likelihood of confusion:

> (1) the degree of similarity between the competing marks; (2) the intent of the alleged infringer in adopting the contested mark; (3) evidence of actual confusion; (4) the similarity of the parties' products and the manner in which the parties

---

[21] *Donchez*, 392 F.3d at 1218 (quotation marks omitted).

[22] *Id.* (quotation marks omitted).

[23] Docket No. 9 ¶ 52.

market them; (5) the degree of care that consumers are likely to exercise in purchasing the parties' products; and (6) the strength of the contesting mark.[24]

"No one of the six factors is dispositive."[25] "The factors are interrelated, and the 'importance of any particular factor in a specific case can depend on a variety of circumstances, including the force of another factor.'"[26] "At all times, however, the key inquiry is whether the consumer is likely to be deceived or confused by the similarity of the marks."[27]

Neither party addressed these factors in any meaningful way. To determine whether there is a likelihood of confusion, it is helpful to distill the two different types of infringement claims Plaintiff is making. The first type of claim relates to Defendants' use of Plaintiff's marks in internet advertising, while the second type of claim relates to Defendants' direct use of the Home Collector series mark. The Court will address the likelihood of confusion relative to each claim.

### a.    Internet Advertising

As stated, the first type of infringement claim Plaintiff brings relates to Defendants' use of Plaintiff's marks in internet advertising. Defendants admit that they use Plaintiff's marks in bidding for keyword advertising. Plaintiff argues that consumers searching for their products will be confused into purchasing Defendants' products because of Defendants' use of Plaintiff's marks. This type of potential confusion is called initial interest confusion. "Initial interest

---

[24] *Hornady Mfg. Co., Inc.*, 746 F.3d at 1001 (citing *Water Pik, Inc.*, 726 F.3d at 1143).

[25] *Id.*

[26] *Id.* (quoting *Water Pik, Inc.*, 726 F.3d at 1143).

[27] *Team Tires Plus, Ltd. v. Tires Plus, Inc.*, 394 F.3d 831, 833 (10th Cir. 2005) (internal quotation marks omitted).

confusion results when a consumer seeks a particular trademark holder's product and instead is lured to the product of a competitor by the competitor's use of the same or a similar mark."[28]

In *1-800 Contacts, Inc. v. Lens.com, Inc*,[29] the Tenth Circuit addressed initial interest confusion in a case where, as here, a competitor was using the plaintiff's marks in its internet advertising. There,

> initial-interest confusion would arise as follows: a consumer enters a query for "1–800 Contacts" on Google; sees a screen with an ad for Lens.com that is generated because of Lens.com's purchase of one of the nine Challenged Keywords; becomes confused about whether Lens.com is the same source as, or is affiliated with, 1–800; and therefore clicks on the Lens.com ad to view the site. Lens.com has exploited its use of 1–800's mark to lure the confused consumer to its website.[30]

In that case, the Tenth Circuit warned against applying the likelihood of confusion factors without attention to context. The court stated:

> The specific issue before us is the likelihood that a consumer who conducts an Internet search for 1–800 Contacts and then sees an ad for Lens.com on the results page will be confused into thinking that Lens.com has a business association with 1–800. To begin with, even if consumers in general may not much care what retailer supplies their contact lenses, the consumers relevant to this suit are looking for a particular retailer. Presumably they have narrowed their search because they have already selected 1–800 as the preferred retailer and are searching for its website or perhaps commentary on its performance. Given the purpose of the search, the shoppers will be attentive to click on those results that will connect them with sites relating to 1–800. In addition, once the consumers see the results page, the substantial dissimilarity between "1–800 Contacts" and "Lens.com" (or its other websites) can be expected to greatly reduce the chance that the consumers will think that the parties are related enterprises; the similarity of the search term and 1–800's mark is of minor relevance.[31]

---

[28] *Australian Gold, Inc. v. Hatfield*, 436 F.3d 1228, 1238 (10th Cir. 2006).

[29] 722 F.3d 1229 (10th Cir. 2013).

[30] *Id.* at 1244.

[31] *Id.* at 1244–45.

Because of these things, the court concluded that "the factors other than evidence of actual confusion . . . firmly support the unlikelihood of confusion."[32]

A similar result is warranted here, at least in regard to Defendants' use of Plaintiff's Vino Grotto mark.[33]  A consumer using the search term Vino Grotto is unlikely to be confused by the appearance of an advertisement for Defendants.  As is demonstrated by Exhibit Q to the Motion, a consumer will be able to easily distinguish between the advertisement placed by Defendants and Plaintiff's actual website.  The advertisement is clearly marked as an ad, while Plaintiff's website is identified directly below the advertisement.  Thus, while certain likelihood of confusion factors would appear to support Plaintiff's argument, its claim suffers from the same deficiencies identified by the court in *1-800 Contacts*.

Turning to the other factors, there is a complete lack of evidence of actual confusion.  Plaintiff alleges, without supporting evidence, that "[t]housands of customers have chosen not to do business with Plaintiff,"[34] but have failed to provide evidence of even a single instance of actual confusion.  While evidence of actual confusion is "not necessary to prevail on a trademark infringement claim, evidence of actual confusion in the marketplace may be the best indication of likelihood of confusion."[35]  There is no such evidence here.

---

[32] *Id.* at 1245.

[33] A different conclusion can be reached as to the Home Collector Series because, as will be discussed, Defendants sold products under that mark in addition to using that mark in internet advertising.  However, as stated above, Plaintiff has failed to demonstrate that its Home Collector Series mark is protectable.

[34] Docket No. 9 ¶ 65.

[35] *Sally Beauty Co., Inc. v. Beautyco, Inc.*, 304 F.3d 964, 974 (10th Cir. 2002).

As with the other factors, the parties have failed to present evidence or argument concerning the degree of care customers exercise in purchasing their products. "A consumer exercising a high degree of care in selecting a product reduces the likelihood of confusion."[36] "[B]uyers typically exercise little care in the selection of inexpensive items that may be purchased on impulse."[37] "Accordingly, items purchased on impulse are more likely to be confused than expensive items, which are typically chosen carefully."[38] "The relevant inquiry focuses on the consumer's degree of care exercised at the time of purchase."[39]

The parties sell a variety of wine racks and cellars, ranging from fairly inexpensive wine racks to customized wine cellars. While customers might not exercise a high degree of care in purchasing a small wine rack for residential use, they are sure to exercise a high degree of care when selecting a company to build a custom cellar. As a result, this factor appears relatively neutral, though weighs slightly against a finding of likelihood of confusion.

The final factor is the strength of the marks. As discussed above, Plaintiff's marks are not terribly strong, especially its Home Collector Series mark. Plaintiff alleges that its marks "have become famous, and the purchasing public, vendors and other entities have come to recognize Plaintiff's . . . common law marks as the distinctive identifier which they are."[40] As with the majority of Plaintiff's claims, however, this claim is without evidentiary support.

---

[36] *Id.* at 975.

[37] *Beer Nuts, Inc. v. Clover Club Foods Co.*, 805 F.2d 920, 926 (10th Cir. 1986) (internal quotation marks omitted).

[38] *Sally Beauty Co., Inc.*, 304 F.3d at 975.

[39] *Id.*

[40] Docket No. 9 ¶ 54.

Therefore, this factor weighs against a finding of confusion. As a result, Plaintiff has failed to show a likelihood of success on its trademark infringement claim as it relates to Defendants' use of Plaintiff's marks in its advertising.

ii.      Direct Use

The second type of claim relates to the direct use of Plaintiff's marks. Defendants admit that they sold a line of products under the Home Collector Series mark during a time in which, they contend, Plaintiff was not using the mark. With regard to this claim, the first, second, and fourth factors support a finding of likelihood of confusion. Plaintiff asserts that Defendants are using the Home Collector Series mark to describe similar products and are doing so in an effort to benefit from the reputation and good will of Plaintiff. Further, the parties sell similar products and market them in similar ways. Thus, these factors appear to weigh in Plaintiff's favor. However, there is no evidence on the other factors—actual confusion, degree of care, and strength of the mark. Moreover, Defendants state that they have ceased using this mark. Therefore, even if Plaintiff could demonstrate a likelihood of success on the merits of this claim, injunctive relief is unnecessary.

2.      *Utah Unfair Competition Act*

The Utah Unfair Competition Act provides a private right of action to a person injured by unfair competition.[41] Unfair competition is defined as

> an intentional business act or practice that:
> (i)(A) is unlawful, unfair, or fraudulent; and
> (B) leads to a material diminution in value of intellectual property; and
> (ii) is one of the following:
> (A) malicious cyber activity;

---

[41] Utah Code Ann. § 13-5a-103(1)(a).

(B) infringement of a patent, trademark, or trade name;
(C) a software license violation; or
(D) predatory hiring practices.[42]

Plaintiff argues that Defendants have engaged in malicious cyber activity.  Malicious cyber activity means:

(a) the unlawful use of computing resources to intimidate or coerce others;
(b) accessing a computer without authorization or exceeding authorized access;
(c) willfully communicating, delivering, or causing the transmission of a program, information, code, or command without authorization or exceeding authorized access; and
(d) intentionally or recklessly:
(i) intends to defraud or materially cause damage or disruption to any computing resources or to the owner of any computing resources; or
(ii) intends to materially cause damage or disruption to any computing resources indirectly through another party's computing resources.[43]

Plaintiff does not acknowledge or address the specific definition of cyber activity contained in the statute.  Rather, Plaintiff simply states that "[m]ost of Defendants' actions took place online with an intent to deceive."[44]  The mere fact that Defendants engaged in online activity is not sufficient to show malicious cyber activity.  The statute provides a specific definition of what conduct constitutes malicious cyber activity.  From the information provided to the Court, there appears to be no evidence that Defendants have engaged in malicious cyber activity as defined by the statute.  Therefore, Plaintiff has failed to demonstrate a likelihood of success on this claim.

---

[42] *Id.* § 13-5a-102(4)(a).

[43] *Id.* § 13-5a-102(3).

[44] Docket No. 13, at 19.

3.      *Tortious Interference with Economic Relations*

"In order to win a tortious interference claim under Utah law, a plaintiff must now prove '(1) that the defendant intentionally interfered with the plaintiff's existing or potential economic relations, (2) . . . by improper means, (3) causing injury to the plaintiff.'"[45]  The "requirement of improper means is satisfied where the means used to interfere with a party's economic relations are contrary to law, such as violations of statutes, regulations, or recognized common-law rules."[46]  "Commonly included among improper means are violence, threats or other intimidation, deceit or misrepresentation, bribery, unfounded litigation, defamation, or disparaging falsehood."[47]  However, "merely persuading another company to withdraw its business from a competitor is not, without more, an improper means under Utah law."[48]

Here, Plaintiff complains that Defendants attempted to force vendors to lock Plaintiff out of the market.  Plaintiff asserts that Defendant Ogzewalla contacted seven vendors, insisting they stop doing business with Plaintiff while also making defamatory comments about Plaintiff and its principals.  The allegations and evidence with respect to each vendor are discussed below.

a.      *WhisperKool*

Plaintiff states that Ogzewalla contacted WhisperKool and demanded WhisperKool cease doing business with Plaintiff.  Unlike some of the other vendors, Plaintiff does not allege that

---

[45] *Eldridge v. Johndrow*, 345 P.3d 553, 565 (Utah 2015) (quoting *Leigh Furniture & Carpet Co. v. Isom*, 657 P.2d 293, 304 (Utah 1982)).  In *Eldridge*, the Utah Supreme Court "disavow[ed] all dicta . . . that would allow liability based solely on an improper purpose."  *Id.*

[46] *Leigh Furniture & Carpet Co.*, 657 P.2d at 308.

[47] *Id.* (quoting *Top Serv. Body Shop, Inc. v. Allstate Ins. Co.*, 582 P.2d 1365, 1371 n.11 (Ore. 1978)).

[48] *SCO Grp., Inc. v. Int'l Bus. Machines Corp.*, 879 F.3d 1062, 1084 (10th Cir. 2018).

Defendants made any misrepresentations or defamatory statements to WhisperKool. Thus, Plaintiff has failed to show improper means. Additionally, it appears that, despite Defendants' alleged actions, WhisperKool did act as a vendor for Plaintiff. As a result, Plaintiff has failed to establish injury.

        b.    *Creekside Manufacturing*

Plaintiff next states that Ogzewalla contacted Creekside Manufacturing and demanded that they cease doing business with Plaintiff. Plaintiff further asserts Ogzewalla made defamatory comments about Plaintiff while doing so.

In response, Defendants have provided the Declaration of Wayne Bailey, the President of Creekside.[49] Mr. Bailey states that Mr. Ogzewalla contacted him, stating that WRA wanted to do business with Creekside, but did not want to buy from Creekside if Creekside was supplying to Vino Grotto. Mr. Bailey was reluctant to cut ties with Vino Grotto and refused Mr. Ogzewalla's offer to pay off the Vino Grotto receivable. Vino Grotto and Creekside continued to do business together. Mr. Ogzewalla later contacted Mr. Bailey in July 2017, seeking to buy products from Creekside. By this time, Vino Grotto had stopped listing Creekside's products on its website and Creekside stopped supplying product to Vino Grotto. Thereafter, Creekside began supplying products to WRA.

Based upon this, Plaintiff has failed to demonstrate that Defendants interfered with Plaintiff's relationship with Creekside, that they did so using improper means, or that Plaintiff

---

[49] Plaintiff objects to the declarations submitted by Defendants. Those objections are without merit.

suffered any injury. Rather, according to the Declaration of Mr. Bailey, Creekside stopped

supplying to Plaintiff because Plaintiff stopped listing Creekside's products on their website.

        *c.     VintageView*

Plaintiff states that Ogzewalla contacted VintageView and demanded VintageView cease

doing business with Plaintiff. In doing so, Plaintiff alleges that Ogzewalla made false and

defamatory statements about Plaintiff. Plaintiff has failed to demonstrate that Defendants

interfered with their relationship with VintageView and has failed to show any injury. Plaintiff

does not assert that VintageView ceased doing business with Plaintiff. Instead, there are

numerous references in the materials suggesting that Plaintiff has and continues to sell

VintageView products.[50]

        *d.     IWA Wine Accessories*

Plaintiff states that Ogzewalla contacted IWA Wine Accessories ("IWA") and demanded

IWA cease doing business with Plaintiff. In doing so, Plaintiff alleges that Ogzewalla made

false and defamatory statements about Plaintiff and its principal.

Defendants have provided the Declaration of Benjamin Argov, the President of IWA.

Mr. Argov states that IWA ceased doing business with a company related to Plaintiff, Walker

Wine Cellars, based on misrepresentations Walker allegedly made while purchasing products

from IWA. Mr. Argov stated that the decision was made independent of Mr. Ogzewalla's

request that IWA not work with Vino Grotto. Further, beginning in March 2018, IWA agreed to

---

    [50] *See* Docket No. 13 Exs. N, P, Q.

supply to Vino Grotto despite continuing to sell products to WRA. Based upon this, Plaintiff has failed to show a likelihood of success as to its claim with respect to IWA.

        e.      *Freightwire*

Plaintiff states that Ogzewalla contacted Freightwire and demanded Freightwire cease doing business with Plaintiff. In doing so, Plaintiff alleges that Ogzewalla made false and defamatory statements about Plaintiff.

Defendants have provided the Declaration of Jared Dabling, Vice President of National Sales at Freightwire. That Declaration states that it was contact from Plaintiff, through Mr. Miller, that prompted Freightwire to not do business with Plaintiff. After Mr. Miller broke away from WRA, he contacted Mr. Dabling and requested shipping services at the same discounted rates it charged to WRA. Mr. Dabling was uncomfortable with the proposal and talked to his bosses about it. It was agreed that Freightwire would not work with Mr. Miller or Vino Grotto. Later, after Freightwire made its decision, Mr. Dabling contacted Mr. Ogzewalla about the situation. Mr. Dabling stated that Mr. Ogzewalla did not ask him to refrain from doing business with Plaintiff, but that he did not have to because the decision had already been made.

Based upon this, Plaintiff has failed to show that Defendants interfered with their relationship with Freightwire. Freightwire made an independent decision not to work with Plaintiff.

        f.      *Wine Guardian*

Plaintiff next states that Ogzewalla contacted Wine Guardian and demanded Wine Guardian cease doing business with Plaintiff. In doing so, Plaintiff alleges that Ogzewalla made false and defamatory statements about Plaintiff.

In response, Defendants have provided the Declaration of Michael Milti, Division Manager at Wine Guardian. Mr. Milti states that while Mr. Ogzewalla did contact him to request that he not do business with Vino Grotto, Mr. Milti did not make a commitment either way. Wine Guardian continued to sell products to Vino Grotto in 2017 and 2018. However, because there was not adequate support for their products, Wine Guardian made the decision to discontinue its business with Vino Grotto. Mr. Milti states that this decision had nothing to do with Ogzewalla's request. Based upon this, Plaintiff has failed to demonstrate that Defendants interfered with their relationship with Wine Guardian or that it suffered any injury.

> g.    *Iron Wine Cellars*

Finally, Plaintiff asserts that Ogzewalla contacted Iron Wine Cellars and made defamatory comments about Plaintiff. However, Plaintiff does not state whether they suffered any injury. Specifically, there is no information as to whether Iron Wine Cellars refused to act as a supplier for Plaintiff based on Defendants' conduct. Without such evidence, Plaintiff has failed to demonstrate a likelihood of success on this claim.

Based upon all of the above, the Court finds that Plaintiff has failed to demonstrate a likelihood of success as to its tortious interference claim.

> 4.    *Common Law Trademark Infringement*

"The elements of common law trademark . . . infringement are similar to those required to prove unfair competition under § 43(a) of the Lanham Act."[51] "[A] plaintiff must establish a protectable interest in its mark, the defendant's use of that mark in commerce, and the likelihood

---

[51] *Donchez*, 392 F.3d at 1219.

of consumer confusion."[52]  For substantially the same reasons set forth above, Plaintiff has failed to demonstrate a likelihood of success as to this claim.

B.      IRREPERABLE HARM

To be entitled to a preliminary injunction, Plaintiff must establish irreparable harm absent the issuance of an injunction.  "Because a showing of probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction, the moving party must first demonstrate that such injury is likely before the other requirements for the issuance of an injunction will be considered."[53] The "irreparable harm requirement is met if a plaintiff demonstrates a *significant risk* that he or she will experience harm that cannot be compensated after the fact by monetary damages."[54]  This is "not an easy burden to fulfill."[55]

"Purely speculative harm will not suffice."[56]  The Supreme Court has explained that "[i]ssuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."[57] As a result, a

---

[52] *Id.*

[53] *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1260 (10th Cir. 2004) (quotation marks omitted).

[54] *Greater Yellowstone Coalition v. Flowers*, 321 F.3d 1250, 1258 (10th Cir. 2003) (internal quotation marks omitted).

[55] *Id.*

[56] *RoDa Drilling Co.*, 552 F.3d at 1210.

[57] *Winter v. Nat'l Res. Defense Council, Inc.*, 555 U.S. 7, 22 (2008).

"conclusory affidavit is not enough to demonstrate irreparable harm."[58] "Courts require more than unsupported factual conclusions to support such a finding."[59]

Plaintiff argues that it has shown irreparable harm because "Defendants' conduct has eroded and threatens to further erode Plaintiff's customer and vendor goodwill."[60] Plaintiff further argues that Defendants' "actions threaten to further diminish the competitive value of Plaintiff's products in ways that could be difficult to measure."[61] "Should Defendants persist in these actions, there is a substantial risk to Plaintiff of lost future profits, damage to its reputation, and loss of goodwill and loss of competitive market position."[62]

While such things may constitute irreparable harm, Plaintiff has failed to provide any evidence to suggest that it has suffered any harm, let alone irreparable harm, as a result of Defendants' conduct. Nor has Plaintiff adequately demonstrated that a preliminary injunction is necessary to avoid any future harm. Plaintiff's conclusory statements, devoid of any factual support, are insufficient to demonstrate irreparable harm. Therefore, even if Plaintiff could demonstrate a likelihood of success on the merits, an injunction is not warranted for this reason alone.

---

[58] *Voile Mfg. Corp. v. Dandurand*, 551 F. Supp. 2d 1301, 1307 (D. Utah 2008).

[59] *Id*; *see also Dominion Video Satellite, Inc.*, 356 F.3d at 1261 ("The statement is wholly conclusory and, standing alone, would not justify the issuance of a preliminary injunction.").

[60] Docket No. 13, at 24.

[61] *Id.*

[62] *Id.* at 25.

C.      REMAINING FACTORS

Because Plaintiff's Motion fails on the first two factors, the Court need not consider the

remaining factors.

### III.  CONCLUSION

It is therefore

ORDERED that Plaintiff's Verified Motion for Preliminary Injunction (Docket No. 13) is

DENIED.  It is further

ORDERED that the hearing set for August 21, 2018, is STRICKEN.

DATED this 15th day of August, 2018.

BY THE COURT:

_____

Ted Stewart
United States District Judge