Scott Hoyt (#14558)
Adam L. Hoyt (#13463)
William O. Kimball (#9460)
**PIA ANDERSON MOSS HOYT, LLC**
136 E. South Temple, Suite 1900
Salt Lake City, UT 84111
Phone: (801) 350-9000
Fax: (801) 350-9010
SHoyt@pamhlaw.com
AHoyt@pamhlaw.com
BKimball@pamhlaw.com

*Attorneys for Defendants*

---

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| JIVE COMMERCE, LLC D/B/A VINO GROTTO, a Utah Limited Liability Company,<br><br>       Plaintiff,<br>vs.<br><br>WINE RACKS OF AMERICA, INC. D/B/A PREMIER WINE CELLARS, a Utah Corporation; and JEFFREY OGZEWALLA, an individual,<br><br>       Defendants. | **FIRST AMENDED ANSWER TO AMENDED VERIFIED COMPLAINT AND COUNTERCLAIM AND THIRD-PARTY COMPLAINT**<br><br><br>Case No. 1:18-cv-00049-TS-BCW<br><br>District Judge Ted Stewart<br><br>Magistrate Judge Brooke C. Wells |
| WINE RACKS OF AMERICA, INC. D/B/A PREMIER WINE CELLARS, a Utah Corporation; and JEFFREY OGZEWALLA, an individual,<br><br>       Counterclaimants and Third-Party Plaintiffs,<br>vs.<br><br>JIVE COMMERCE, LLC D/B/A VINO GROTTO, a Utah Limited Liability Company; and JASON MILLER, an individual,<br><br>       Counterclaim and Third-Party Defendants. | |

Defendants and Counterclaim Plaintiffs Wine Racks America, Inc. d/b/a Premier Wine Cellars (**"WRA"**) and Jeffrey Ogzewalla (**"Mr. Ogzewalla"**) (collectively, **"Defendants"** or **"Counterclaim Plaintiffs"**) by and through undersigned counsel, do hereby answer the First Amended Verified Complaint (**"Complaint"**) filed against them by Plaintiff and Counterclaim Defendant Jive Commerce, LLC d/b/a Vino Grotto (**"Jive"**), and do hereby complain against Counterclaim Defendant Jive and Third-Party Defendant Jason Miller (**"Mr. Miller"**) (collectively, **"Counterclaim Defendants"**) as follows:

## ANSWER TO FIRST AMENDED VERIFIED COMPLAINT

### FIRST DEFENSE

The Complaint fails to state a claim against Defendants upon which relief can be granted.

### SECOND DEFENSE

Defendants respond to the specifically numbered paragraphs of the Complaint as follows, specifically reserving the right to amend or supplement their responses as further discovery and investigation may warrant. To the extent that this Answer includes the cause of action headings as in the Complaint is merely descriptive in nature and is in no way intended as recognition of the veracity of any such cause of action.

### PARTIES, JURISDICTION & VENUE

1.      Admit that Jive Commerce, LLC is a Utah limited liability company in good standing with its principal place of business in Davis County, State of Utah, but allege that the registered d/b/a under which Jive does business is "Vinogrotto" and not "Vino Grotto."

2.      Admit that Wine Racks America, Inc. is a Utah corporation with its principal place of business in Davis County, Utah, and that it does some business under the registered d/b/a Premier Wine Cellars.

3.      Admit that Premier Wine Cellars is a DBA of Wine Racks America, Inc.

4.      Defendants admit the allegations in paragraph 5.

5.      Admit that the Court has subject matter jurisdiction in this action, but specifically deny that the Court has jurisdiction pursuant to 28 U.S.C. § 1332.

6.      Admit that venue is proper.

7.      Admit that the Court has personal jurisdiction over the Defendants.

## GENERAL ALLEGATIONS

8.      Admit the first sentence but deny the remaining allegations.

9.      Defendants lack sufficient knowledge or information to form a belief as to the truth of the assertions and therefore deny the same. Defendants affirmatively assert that the owner(s) of Plaintiff surreptitiously created Plaintiff and/or its present or past affiliates, and began competing with Defendants, utilizing Defendants' confidential information and trade secrets, while they were still working for Defendants.

10.     Defendants lack sufficient knowledge or information to form a belief as to the truth of the assertions and therefore deny the same.

11.     Admit and affirmatively assert that Miller was an officer of WRA.

12.     Defendants admit the allegations in paragraph 12.

13.     Admit that Exhibit A contains screen shots from WRA's website and that Defendant Ogzewalla bought Miller's ownership for $2,500.00, but deny the remaining allegations.

14.     Admit that after Miller was bought out, he was employed by WRA and that Ogzewalla and Miller exchanged proposals regarding Miller's continued employment, but deny the remaining allegations.

3

15.     Admit that a former employee of WRA started a competitive business known as "Old Town Wine Racks," and that Ogzewalla subsequently purchased the Domain name and briefly posted a caricature of the former employee on the Old Town website, but deny the remaining allegations.

16.     Defendants deny the allegations in paragraph 16.

17.     Defendants deny the allegations of paragraph 17.

18.     Admit that Exhibit D represents some of the correspondence between counsel for Miller and Defendants, which speak for themselves, but deny the remaining allegations.

19.     Admit that Miller surreptitiously created and worked for one or more competing businesses while still employed by Defendants, utilizing Defendants' confidential information and trade secrets, all to the financial detriment of Defendants.   Defendants deny the remaining allegations.

20.     Defendants deny the allegations in paragraph 20.

21.     Defendants deny the allegations in paragraph 21 and subparts (a) – (h).

22.     Defendants deny the allegations in paragraph 22.

23.     Defendants lack sufficient knowledge or information to form a belief as to the authenticity of the documents in Exhibit S and deny that these documents were "from" Defendant, and deny the remaining allegations.

24.     Defendants deny the allegations in paragraph 24.

25.     Admit that Ogzewalla registered the domain rbsalesco.com in or about February 2018, but deny the remaining allegations.

26.     Admit that on or about April 1, 2015, a website was created at premierwinecellars.com ("**PWC**") by Jeff Ogzewalla, the registered owner of PWC, but deny the

remaining allegations.

27.    Defendants deny the allegations in paragraph 27.

28.    Admit that Exhibit E is a screen shot from the PWC website, but deny the remaining allegations.

29.    Defendants deny the allegations in paragraph 29.

30.    Defendants deny the allegations in paragraph 30 and affirmatively allege that from its inception, and continuing to date, PWC does business in Oregon.

31.    Defendants deny the allegations in paragraph 31 and affirmatively allege that PWC operations are conducted at the pictured facility where WRA operations are also conducted.

32.    Admit that the pictured building is located in Davis County, Utah, and that operations for both WRA and PWC are performed there, but deny the remaining allegations.

33.    Defendants deny the allegations in paragraph 33.

34.    Defendants deny the allegations in paragraph 34.

35.    Admit that certain of the listed reviews are by employees of PWC and/or WRA, but deny the remaining allegations.

36.    Admit that certain of the listed reviews are by employees of PWC and/or WRA, and affirmatively allege the reviews are truthful opinions of individuals whose names are disclosed, and not forgeries.

37.    Admit that WRA has accounts with many companies, including the four referenced companies, but deny the remaining allegations.

38.    Defendants deny the allegations in paragraph 38.

39.    Defendants deny the allegations in paragraph 39.

40.    Admits that the pictured logo has been used by PWC, but deny the remaining

allegations.

41.     Admit that Plaintiff has used the pictured logo but deny the remaining allegations.

42.     Admit that the pictured logo has been used by PWC, but deny the remaining allegations.

43.     Admit that Plaintiff has sold product under the name "All-American Series," but deny the remaining allegations.

44.     Admit that PWC for a period of time sold some product under the name "All-American Series," and affirmatively allege that all references to this name have been removed from the PWC website and that PWC no longer sells product under this name.  Defendants deny the remaining allegations.

45.     Defendants lack sufficient knowledge or information to form a belief as to the truth of the assertions and therefore deny the same.

46.     Admit that PWC had briefly advertised products under the name Pro Series, and assert that Exhibit M speaks for itself, but deny the remaining allegations.

47.     Defendants lack sufficient knowledge or information to form a belief as to the truth of the assertions and therefore deny the same.  Defendants assert that Exhibit N, to the extent that it is authentic, speaks for itself.

48.     Admit that PWC advertised its Living Series product line under the name Home Collector series for a brief period of time, but deny the remaining allegations.

49.     Defendants lack sufficient knowledge or information to form a belief as to the truth of the assertions and therefore deny the same.

50.     Defendants deny the allegations in paragraph 50. Plaintiff's website home page depicts in part, exact copies of WRA's website home page and also depicts products that it does

6

not make or distribute, but deny the remaining allegations.

51.    Defendants deny the allegations in paragraph 51.

52.    Defendants deny the allegations in paragraph 52.

53.    Defendants deny the allegations in paragraph 53.

54.    Defendants deny the allegations in paragraph 54.

55.    Defendants deny the allegations in paragraph 55.

56.    Defendants deny the allegations in paragraph 56.

57.    Defendants deny the allegations in paragraph 57.

58.    Defendants deny the allegations in paragraph 58.

59.    Defendants deny the allegations in paragraph 59.

60.    Defendants deny the allegations in paragraph 60.

61.    Defendants deny the allegations in paragraph 61.

62.    Defendants deny the allegations in paragraph 62.

63.    Defendants deny the allegations in paragraph 63.

64.    Defendants deny the allegations in paragraph 64.

***Plaintiff's Damages***

65.    Deny the first sentence.  Defendants lack sufficient knowledge or information to form a belief as to the truth of the assertions of the second sentence and therefore deny the same. Defendants deny the third sentence and the remaining allegations.

66.    Defendants deny the allegations in paragraph 66.

## FIRST CAUSE OF ACTION
### UNFAIR COMPETITION
### 15 U.S.C. § 1125(a)

67.    Defendants incorporate their answers to paragraphs 1-66.

68.     Defendants deny the allegations in paragraph 68.

69.     Defendants deny the allegations in paragraph 69.

70.     Defendants deny the allegations in paragraph 70.

71.     Defendants deny the allegations in paragraph 71.

72.     Defendants deny the allegations in paragraph 72.

73.     Defendants deny the allegations in paragraph 73.

74.     Defendants deny the allegations in paragraph 74.

75.     Defendants deny the allegations in paragraph 75.

76.     Defendants deny the allegations in paragraph 76.

77.     Defendants deny the allegations in paragraph 77.

## SECOND CAUSE OF ACTION
## COMMON LAW UNFAIR COMPETITION

78.     Defendants incorporate their answers to paragraphs 1-77.

79.     Defendants lack sufficient knowledge or information to form a belief as to the truth of the assertions and therefore deny the same.

80.     Defendants lack sufficient knowledge or information to form a belief as to the truth of the assertions and therefore deny the same.

81.     Admit.

82.     Defendants deny the allegations in paragraph 82.

83.     Defendants deny the allegations in paragraph 83.

84.     Defendants deny the allegations in paragraph 84.

85.     Defendants deny the allegations in paragraph 85.

86.     Defendants deny the allegations in paragraph 86.

87.     Defendants deny the allegations in paragraph 87.

88.     Defendants deny the allegations in paragraph 88.

89.     Defendants deny the allegations in paragraph 89.

90.     Defendants deny the allegations in paragraph 90.

91.     Defendants deny the allegations in paragraph 91.

92.     Defendants deny the allegations in paragraph 92.

**THIRD CAUSE OF ACTION**
**UNFAIR COMPETITION AND FALSE DESIGNATION OF ORIGIN**
**15 Utah Code § 13-5a-101 et seq.**

93.     Defendants incorporate their answers to paragraphs 1-92.

94.     Defendants deny the allegations in paragraph 94.

95.     Defendants deny the allegations in paragraph 95.

96.     Defendants deny the allegations in paragraph 96.

97.     Defendants deny the allegations in paragraph 97.

98.     Defendants deny the allegations in paragraph 98.

99.     Defendants deny the allegations in paragraph 99.

**FOURTH CAUSE OF ACTION**
**TRADE LIBEL**
**15 U.S.C. § 1125(a)**

100.    Defendants incorporate their answers to paragraph 1-99.

101.    Defendants deny the allegations in paragraph 101.

102.    Defendants deny the allegations in paragraph 102.

103.    Defendants deny the allegations in paragraph 103.

104.    Defendants deny the allegations in paragraph 104.

105.    Defendants deny the allegations in paragraph 105.

## FIFTH CAUSE OF ACTION
## COMMON LAW DEFAMATION

106.    Defendants incorporate their answers to paragraphs 1-105.

107.    Defendants deny the allegations in Paragraph 107, including subparts (a) – (d).

108.    Defendants deny the allegations in paragraph 108.

109.    Defendants deny the allegations in paragraph 109.

110.    Defendants deny the allegations in paragraph 110.

111.    Defendants deny the allegations in paragraph 111.

## SIXTH CAUSE OF ACTION
## COMMON LAW TRADEMARK INFRINGEMENT – VINO GROTTO

112.    Defendants incorporate their answers to paragraphs 1-111.

113.    Defendants lack sufficient knowledge or information to form a belief as to the truth
of the assertions and therefore deny the same.

114.    Defendants deny the allegations in paragraph 114.

115.    Defendants deny the allegations in paragraph 115.

116.    Defendants deny the allegations in paragraph 116.

117.    Defendants deny the allegations in paragraph 117.

118.    Defendants deny the allegations in paragraph 118.

119.    Defendants deny the allegations in paragraph 119.

## SEVENTH CAUSE OF ACTION
## COMMON LAW TRADEMARK INFRINGEMENT – HOME COLLECTOR SERIES

120.    Defendants incorporate their answers to paragraphs 1-119.

121.    Defendants deny the allegations in paragraph 121.

122.    Defendants deny the allegations in paragraph 122.

123.    Defendants deny the allegations in paragraph 123.

124.    Defendants deny the allegations in paragraph 124

125.    Defendants deny the allegations in paragraph 125.

126.    Defendants deny the allegations in paragraph 126.

127.    Defendants deny the allegations in paragraph 127.

## EIGHTH CAUSE OF ACTION
### FALSE ADVERTISING
### 15 U.S.C. § 1125(a)

128.    Defendants incorporate their answers to paragraphs 1-128 above.

129.    Defendants deny the allegations in paragraph 129.

130.    Defendants deny the allegations in paragraph 130.

131.    Defendants deny the allegations in paragraph 131.

132.    Defendants deny the allegations in paragraph 132.

133.    Defendants deny the allegations in paragraph 133.

134.    Defendants deny the allegations in paragraph 134.

135.    Defendants deny the allegations in paragraph 135.

136.    Defendants deny the allegations in paragraph 136.

## NINTH CAUSE OF ACTION
### CLAIM FOR CORRECTIVE ADVERTISING DAMAGES

137.    Defendants incorporate their answers to paragraphs 1-136.

138.    Defendants deny the allegations in paragraph 138.

139.    Defendants deny the allegations in paragraph 139.

140.    Defendants deny the allegations in paragraph 140.

141.    Defendants deny the allegations in paragraph 141.

142.    Defendants deny the allegations in paragraph 142.

143.    Defendants deny the allegations in paragraph 143.

144.    Defendants deny the allegations in paragraph 144.

145.    Defendants deny the allegations in paragraph 145.

146.    Defendants deny the allegations in paragraph 146.

## TENTH CAUSE OF ACTION
### INTENTIONAL INTERFERENCE WITH EXISTING AND PROSPECTIVE ECONOMIC RELATIONS

147.    Defendants incorporate their answers to paragraphs 1-146.

148.    Defendants deny the allegations in paragraph 148.

149.    Defendants deny the allegations in paragraph 149.

150.    Defendants deny the allegations in paragraph 150.

151.    Defendants deny the allegations in paragraph 151.

152.    Defendants deny the allegations in paragraph 152.

## ELEVENTH CAUSE OF ACTION
### DECEPTIVE TRADE PRACTICES
### 15 Utah Code § 13-5a-101 et seq.

153.    Defendants have concurrently filed a Motion to Dismiss this cause of action. Defendants will provide answers to paragraphs 153 – 157 in the event that the Motion to Dismiss is denied.

154.    *See* Response to ¶ 153.

155.    *See* Response to ¶ 153.

156.    *See* Response to ¶ 153.

157.    *See* Response to ¶ 153.

158.    *See* Response to ¶ 153.

159.   *See* Response to ¶ 153.

## TWELFTH CAUSE OF ACTION
### UNJUST ENRICHMENT

160.   Defendants incorporate their answers to paragraphs 1-159.

161.   Defendants deny the allegations in paragraph 161.

162.   Defendants deny the allegations in paragraph 162.

163.   Defendants deny the allegations in paragraph 163.

164.   Defendants deny the allegations in paragraph 164.

165.   Defendants deny the allegations in paragraph 166.

## AFFIRMATIVE DEFENSES

## THIRD DEFENSE

Defendants deny each and every allegation in the Complaint that is not expressly admitted herein.

## FOURTH DEFENSE

The alleged damages or injury sustained by Plaintiff were caused in whole or in part by Plaintiff's own negligence and fault, and/or the negligence and fault of third parties, and, therefore, there can be no award of damages in this action against Defendants.

## FIFTH DEFENSE

Plaintiff's claims are barred to the extent damages allegedly sustained by Plaintiff were the result of intervening and/or superseding acts or omissions by parties over whom Defendants have no control.

## SIXTH DEFENSE

Plaintiff's damages, if any, are barred to the extent Plaintiff failed to mitigate its own damages.

## SEVENTH DEFENSE

By their own actions and inactions, Plaintiff is estopped to assert, or has waived and released, the claims contained in the Complaint asserted against Defendants.

## EIGHTH DEFENSE

Plaintiff is prohibited or should be prohibited from receiving some or all of the relief requested as a result of his own lack of equitable conduct, good faith, and reasonableness.

## NINTH DEFENSE

To the extent monies are due and owing from Plaintiff to Defendants, or Defendants have incurred damages due to Plaintiff's prior acts, Defendants may be entitled to a set-off for those amounts.

## TENTH DEFENSE

Plaintiff's claims are barred, in whole or in part, because Defendants acted in good faith, without malice, and with reasonable belief in the lawfulness and factual accuracy of their actions and statements, and consequently Defendants did not commit any intentional violation of law.

## ELEVENTH DEFENSE

Plaintiff's claims are barred, in whole or in part, inasmuch as federal law preempts some or all of Plaintiff's claims.

## TWELFTH DEFENSE

Plaintiff lacks standing to sue inasmuch has it has failed to establish that it is the owner of the trademarks alleged to have been infringed, or that the alleged trademarks are protectable under the law.

## THIRTEENTH DEFENSE

Plaintiff's claims are barred, in whole or in part, by the statute of frauds and the doctrine of laches.

## FOURTEENTH DEFENSE

Plaintiff's claims made in the Complaint are barred, in whole or in part, on the basis that some or all marks at issue are generic.

## FIFTEENTH DEFENSE

Plaintiff's claims are barred, in whole or in part, on the basis that some or all marks at issue lack secondary meaning.

## SIXTEENTH DEFENSE

Defendants have not infringed any applicable trademarks under federal or state law.

## SEVENTEENTH DEFENSE

Without admitting that the Complaint states a claim, there has been no damage in any amount, manner, or at all by reason of any act alleged against Defendants in the Complaint and the relief prayed for in the Complaint therefore cannot be granted.

## EIGHTEENTH DEFENSE

Plaintiff's claims for injunctive relief are barred because Plaintiff cannot show that it will suffer any irreparable harm from Defendants' actions.

## NINETEENTH DEFENSE

The alleged injury or damage suffered by Plaintiff, if any, would be adequately compensated by damages.  Accordingly, Plaintiff has a complete and adequate remedy at law and is not entitled to see equitable relief.

## TWENTIETH DEFENSE

No act or omission of Defendants was done with a knowing or reckless indifference toward, or a disregard of, the rights and safety of others, and therefore any award of punitive damages is barred.

## TWENTY-FIRST DEFENSE

The claims made in the Complaint are barred, in whole or in part, because Plaintiff comes to the court with unclean hands.

## TWENTY-SECOND DEFENSE

The claims made in the Complaint are barred, in whole or in part, by the First Amendment to the Constitution of the United States.

Defendants incorporate by reference each and every defense heretofore asserted in this action and reserves the right to assert additional defenses as they become apparent during the course of this litigation.  In the event Plaintiff identifies facts that give rise to such additional affirmative defenses not enumerated herein, Defendants intend to amend this Answer to assert them.

## ANSWER RELIEF REQUESTED

WHEREFORE, Defendants request that the Court dismiss the Complaint with prejudice, that they be awarded their costs and attorney fees incurred in this matter, and that they be awarded judgment for such further relief as the Court deems just and equitable.

16

## COUNTERCLAIM/THIRD-PARTY COMPLAINT

### PARTIES

1.     Counterclaim Plaintiff Wine Racks America (**"WRA"**) was, at all relevant times herein, a Utah corporation whose principal place of business was in Davis County, Utah.

2.     Counterclaim Plaintiff Jeffrey Ogzewalla was, at all relevant times herein, a citizen of the state of Oregon (July 2011 to July 2015) and a citizen of Utah (July 2015 to present).

3.     Counterclaim Defendant Jive Commerce, LLC, (**"Jive"**) was, at all relevant times herein, a Utah limited liability company whose principal place of business was in Davis County, Utah.

4.     Third-Party Defendant Mr. Miller was, at all relevant times herein, a citizen of the state of Utah.

5.     Mr. Miller is hereby joined pursuant to Rule 13(h) of the Federal Rules of Civil Procedure and Rule 19(a) and Rule 20(a)(2) of the Federal Rules of Civil Procedure.

### JURISDICTION AND VENUE

6.     This is a counterclaim for breach of contract, breach of the implied covenant of good faith and fair dealing, breach of implied contract/promissory estoppel, and unjust enrichment which arise out of the same transactions and occurrences that underlie the claims brought by Jive against Counterclaim Plaintiffs alleging violations of the Lanham Act, 28 U.S.C. § 1125, and 15 U.S.C. § 1052 et seq. The Court has subject matter jurisdiction or supplemental jurisdiction over those claims and the instant counterclaims pursuant to 28 U.S.C. §§ 1331, 1338(a), 1338(b); Utah Code § 78-27-24 through Federal Rule of Civil Procedure 4(K)(1)(A); and 28 U.S.C. § 1367, as described in the Complaint.

7.     Venue in this district is proper under 28 U.S.C. §§ 1391, 1400(b), and 15 U.S.C.

§ 1125.

8.      This Court has personal jurisdiction over Jive and Mr. Miller because, inter alia, they reside and do business in the state of Utah pursuant to Utah Code § 78B-3-307 and Utah Code § 78B-3-205 et seq.

## GENERAL ALLEGATIONS

9.      In 2003, Mr. Ogzewalla and Mr. Miller began WRA together.

10.     In 2004, Mr. Ogzewalla bought Mr. Miller's interest in WRA and began running WRA alone.

11.     In 2009, Mr. Miller was hired by WRA to assist an existing employee, Ian Campbell, with web development projects.

12.     Later in 2009, Ian Campbell's twin brother, Vince Campbell, joined WRA's sales team.

13.     In 2010, Mr. Ogzewalla moved to Bend, Oregon, and began running WRA remotely.

14.     Mr. Ogzewalla promoted Mr. Miller to Director of Operations with the understanding that Mr. Miller would supervise day-to-day operations, web development, and other business areas while Mr. Ogzewalla was in Oregon.

15.     In September 2011, Mr. Miller and Mr. Ogzewalla had a meeting in which Mr. Miller expressed frustration with his role at WRA and made clear his desire to "take the wheel." Consequently, Mr. Ogzewalla allowed Mr. Miller to take over the company's marketing budgets and gave him hiring and firing authority.

16.     Mr. Miller immediately increased WRA's spending, hired new employees, and began expansion plans for 2012.

17.     Mr. Miller also drafted and circulated a new employee handbook, a true and correct copy of which is attached as **Exhibit A-1**. All employees and managers were required to sign the last page of the handbook, which contained an "Acknowledgment of Receipt & Understanding."

18.     The handbook included clauses prohibiting the signatory from engaging in competing employment or soliciting WRA employees for a twelve-month period following the signatory's termination.

19.     The non-competition clause provided: "Due to the highly competitive nature of the industry in which [WRA] is involved, employees are restricted from certain associations or working arrangements with competing or conflicting organizations. Subject to [WRA's] prior written approval, you may work for other businesses during the court of your employment with [WRA]; provided, however, you may not (i) accept or perform work of a nature that conflicts or competes in any way with the business or services of [WRA]; (ii) use any [WRA] resources including, but not limited to, computer hardware and software, telephones, facsimile machines, and copiers, for or in connection with any non-[WRA] work; (iii) perform any non-[WRA] business on [WRA] premises; or (iv) perform any non-[WRA] work during normal business hours."

20.     The non-solicitation clause provided: "During the period of your employment and for a period of twelve (12) months after the termination of your employment with [WRA], you shall not, directly or indirectly, (i) solicit for employment or employ any person who was employed by [WRA] during your employment with [WRA]; or (ii) call on, solicit, or take away for yourself or for any other person or entity any person or entity who or which was a customer of [WRA] during your employment with [WRA]."

21.     The handbook also required the signatory to conduct themselves in a professional

and ethical manner, prohibited the signatory from influencing other employees to act unethically, and to report any dishonesty or damaging conduct to the signatory's supervisor.

22.     The handbook further required the signatory not to threaten any violence by or against any employee, customer, supplier, partner or visitor.

23.     In October 2011, Mr. Miller asked for an ownership stake in WRA and an increased salary in the range of $200,000 to $300,000. Mr. Miller stated that, if turned down, he would go to another company.

24.     Mr. Ogzewalla rejected Mr. Miller's demands but agreed to increase Mr. Miller's salary from $90,000 to $180,000.

25.     In early 2012, Mr. Ogzewalla discovered that Mr. Miller had spent large sums of money without consulting Mr. Ogzewalla to remodel existing offices, a conference room, kitchen, and breakrooms and to buy new computers, a CCTV network, and other office improvements.

26.     Despite his increased salary, Mr. Miller indicated in March 2012 that he was financially strapped and needed help meeting his personal obligations. Mr. Ogzewalla agreed to loan Mr. Miller $20,000 without interest, to be paid back against Mr. Miller's salary and bonus.

27.     In December 2012, Mr. Miller's wife approached a WRA business partner, Francisco Mora, to outline financial difficulties she and Mr. Miller were experiencing, and she asked for a $1,000 loan.

28.     Upon learning of the request, Mr. Miller took Mr. Mora into a conference room at WRA's offices and unleashed a tirade of invective, including screaming at a volume that other employees could hear.

29.     During the course of his tirade, Mr. Miller threatened Mr. Mora, telling him that if he brought up money again, Mr. Miller would "kick his head in."

30.     In early 2013, after a failed expansion plan, Mr. Ogzewalla informed Mr. Miller that Mr. Ogzewalla would be returning to Utah to address WRA's problems, that it would be necessary to institute a hiring and expense freeze, and that Mr. Ogzewalla and Mr. Miller would both have to take a pay cut.

31.     Shortly thereafter, Mr. Miller registered Jive Commerce, LLC, as evidenced by its business entity registration, a true and correct copy of which is attached as **Exhibit A-2** Viewing this entity as their exit strategy from WRA, Mr. Miller and Ian Campbell lost interest in WRA and their quantity and quality of work deteriorated. Mr. Miller's later actions, as alleged below, were undertaken to further Jive's interests.

32.     On February 26, 2013, Mr. Miller asked Christian Hancock, a WRA sales manager, to become a private dealer for WRA's biggest competitor, Wine Cellar Innovations. Mr. Miller also asked Mr. Hancock for a $50,000 loan so that Mr. Miller could quit WRA and dedicate himself to the Jive Commerce venture. Mr. Hancock refused, and Mr. Miller remained with WRA.

33.     Beginning in March 2013, Mr. Miller began to pick fights with long-term employees, firing some on-site without reason and without following proper HR procedures. In doing so, Mr. Miller made a large scene, including cursing at the employees. Mr. Miller defamed Mr. Ogzewalla to WRA employees and attempted to require WRA employees to report only to Mr. Miller.

34.     In March 2013, Mr. Miller stopped coming to the office regularly, informing his assistant that he had outside projects to work on, that he was going to be working from home, and that she should manually punch him in and out of the time clock each day in order to make it look like he had been at work all day. A true and correct copy of Mr. Miller's electronic time card, showing punch in and punch out times that are seconds apart (in the column "Created Time"), is

attached as **Exhibit A-3**.

35.     Mr. Miller allowed Ian Campbell to join him each day, instructing his assistant to manually punch Ian Campbell in and out of the time clock each day in order to make it look like Ian Campbell had been at work all day. A true and correct copy of Ian Campbell's electronic time card, showing punch in and punch out times that are seconds apart, is attached as **Exhibit A-4**.

36.     Mr. Miller fired WRA's long-time warehouse manager, and replaced him with Vince Campbell, who was unqualified and uninterested in running the warehouse.

37.     Mr. Miller allowed Vince Campbell to join him each day, instructing his assistant to manually punch Vince Campbell in and out of the time clock each day in order to make it look like Vince Campbell had been at work all day. A true and correct copy of Vince Campbell's electronic time card, showing punch in and punch out times that are seconds apart, is attached as **Exhibit A-5**.

38.     Around this time, Mr. Miller began to send WRA's salaried, five-member web development team home early on most days, with the understanding that they would be paid for the entire day. The web development team were often sent home after as little as one hour of work despite drawing their full salary, all with Mr. Miller's permission. Indeed, when one employee asked to remain at the office to get some work done, Mr. Miller refused to allow him to stay and told him that going home when the rest of the web development team was sent home was mandatory.

39.     Consequently, at Mr. Miller's direction, Ian Campbell, Vince Campbell, Mr. Miller, and the web development were paid for thousands of hours of work that were never delivered.

40.     In December 2013, Mr. Miller and Ian Campbell recruited John Walker to help

them form a competing wine rack venture, organized as a New Jersey limited liability company named JW Cellars. A true and correct copy of JW Cellars' corporate registration is attached as **Exhibit A-6**

41.     On December 24, 2013, Mr. Miller, with Mr. Walker's assistance, registered the domain WalkerWineCellars.com. A true and correct copy of the WHOIS domain name registration data for WalkerWineCellars.com is attached as **Exhibit A-7**.

42.     At Mr. Miller's direction, John Walker contacted WRA's suppliers posing as a New Jersey contractor interested in selling their wine racks and related products to his local customers.

43.     Having secured access to wine racks and related products made by WRA's suppliers, Mr. Miller began selling those wine racks and related products on Amazon.com, copying WRA's content, model, and strategies.

44.     While engaged in this side business, Mr. Miller continued drawing his salary as an employee of WRA.

45.     On March 5, 2013, Mr. Miller again solicited Mr. Hancock to compete with WRA, this time by becoming a dealer for WRA's largest competitor and hiring Mr. Miller and Ian Campbell to build a website for Mr. Hancock.

46.     When Mr. Hancock refused, Mr. Miller became hostile and verbally abused Mr. Hancock at the top of his lungs in front of a group of co-workers.

47.     Around this time, Mr. Miller solicited another WRA employee, Rori Chandler, with a similar offer to compete against WRA.

48.     On March 10, 2014, Mr. Hancock gave notice of his resignation due to the work atmosphere created by Mr. Miller. Mr. Hancock arranged for his last day to be March 28, 2018.

49.     On March 28, 2014, in coordination with Mr. Hancock's last day, Mr. Miller, Ian

23

Campbell, and Vince Campbell resigned from WRA.

50.     On or about March 28, 2014, Mr. Miller entered WRA's locked human resources office, accessed a locked file cabinet containing personnel folders, and removed the signed "Acknowledgement of Receipt & Understanding" handbook pages from his personnel folder, from Ian Campbell's folder, and from Vince Campbell's folder.

51.     On or about March 28, 2014, Mr. Miller and Ian Campbell, without authorization or approval, "wiped" their company-issued computers completely, removing all company data and correspondence records.

52.     On or about March 28, 2014, Mr. Miller took twelve hourly workers off their posts to move his personal effects from Mr. Ogzewalla's house, where Mr. Miller had been living, to a newly rented location. After they completed this task, Mr. Miller gave them the rest of the day off with, at WRA's expense.

53.     On April 3, 2014, Mr. Miller solicited WRA's office manager, Jacquie Lipp, to leave WRA and work for him.

54.     On April 4, 2014, Mr. Miller registered the domain VinoGrotto.com.

55.     Mr. Miller approached Wayne Bailey about duplicating WRA product designs to manufacture and sell wine racks as Vino Grotto products. Mr. Bailey agreed, and manufactured such wine racks for Vino Grotto until late 2016.

56.     On April 15, 2014, Mr. Miller solicited WRA employee Jordan Jones for an unspecified job position working for Mr. Miller and Ian Campbell.

57.     In September 2014, the VinoGrotto.com website was launched by Jive and Mr. Miller, selling wine racks that were clearly knock-offs of WRA's products.

58.     A true and correct copy of Mr. Ogzewalla's declaration, attesting to the facts and

24

allegations set forth above, is attached as **Exhibit A-8**.

## **GROUNDS FOR RELIEF**

### **COUNT I – Against Mr. Miller**
**(Breach of Contract)**

59.     Counterclaim Plaintiffs reallege and incorporate by reference paragraphs 1 through 59 of the counterclaim, as if fully set forth at length herein and further allege as follows:

60.     Mr. Miller entered into a valid and binding contract with WRA in the form of the employee handbook that he drafted, circulated, and signed.

61.     Mr. Miller breached that contract when he violated the Standards of Conduct clause contained therein, which required employees to "conduct themselves in a professional and ethical manner" and provided that employees "should not conduct business that is unethical in any way." (See Exh. A, p.6)

a.   While employed by WRA, Mr. Miller screamed at Mr. Mora, WRA's business partner.

b.   While employed by WRA, Mr. Miller threatened to "kick in [Mr. Mora's] head."

c.   While employed by WRA, Mr. Miller fired employees without reason and without following human resources procedures.

d.   While employed by WRA, Mr. Miller made a large scene while firing employees, including cursing at them in front of other employees.

e.   While employed by WRA, Mr. Miller verbally abused Mr. Hancock in front of a group of co-workers when Mr. Hancock refused to leave WRA to compete against WRA.

f.   While employed at WRA, an employee wrote a critical comment about Mr. Miller

25

and put it in the company's suggestion box.  When Mr. Miller read the comment he had WRA employees line up and stated that he would "kick the ass" of the person who wrote the comment and demanded to know who wrote it.   Mr. Miller discovered the employee who wrote the comment and fired him within 48 hours, and made threats against the employee and his family.

g.  As a direct and proximate of Mr. Miller's breaches of the contract's Standards of Conduct clause, WRA has suffered and will continue to suffer damages in an amount to be proven at trial, including consequential damages.

62.   Mr. Miller breached the contract when he violated the Standards of Conduct clause contained therein, which forbade employees from "influenc[ing] other employees to act unethically." (See Exh. A, p.6)

a.  While employed by WRA, Mr. Miller instructed his assistant to falsify his workplace attendance records by punching his time card in and out on his behalf when he was not present.

b.  While employed by WRA, Mr. Miller instructed his assistant to falsify Ian Campbell's workplace attendance records by punching Ian Campbell's time card in and out on his behalf when he was not present.

c.  While employed by WRA, Mr. Miller instructed his assistant to falsify Vince Campbell's workplace attendance records by punching Vince Campbell's time card in and out on his behalf when he was not present.

d.  While employed by WRA, Mr. Miller instructed the five member web development team to leave work early on many days while still drawing pay and benefits as if they had worked full days.

e.   While employed by WRA, Mr. Miller instructed twelve hourly WRA workers to leave their workplace during a workday to move his personal belongings from one location to another and then instructed the workers to take the rest of the day off, while drawing their full pay as if they had been engaged in productive work at WRA.

f.   As a direct and proximate of Mr. Miller's breaches of the contract's Standards of Conduct clause, WRA has suffered damages in an amount to be proven at trial, including consequential damages, because the breaches resulted in WRA paying Mr. Miller, Ian Campbell, Vince Campbell, and the five member web development team for time in which they did not complete any WRA work.

63.   Mr. Miller breached the contract when he violated the Personnel File clause contained therein, which forbade employees from copying or removing personnel files from WRA premises. (See Exh. A, p.6)

a.   On or about March 28, 2014, while employed by WRA, Mr. Miller entered WRA's locked human resources office, accessed a locked file cabinet containing personnel folders, and removed files or portions of files from his personnel folder, from Ian Campbell's personnel folder, and from Vince Campbell's personnel folder.

b.   As a direct and proximate of Mr. Miller's breaches of the contract's Personnel File clause, WRA has suffered damages in an amount to be proven at trial, including consequential damages, because among other things WRA has had to verify the integrity of all personnel files Mr. Miller may have accessed.

64.   Mr. Miller breached the contract when he violated the Violence & Weapons clause contained therein, which provided that "Any act or threat of violence by or against any employee,

customer, supplier, partner or visitor is strictly prohibited." (See Exh. A, p.13)

    a.  While employed by WRA, Mr. Miller threatened Mr. Mora by telling him that if Mr. Mora brought up money again, he would "kick his head in."

    b.  As a direct and proximate of Mr. Miller's breach of the contract's Violence & Weapons clause, WRA has suffered damages in an amount to be proven at trial, including consequential damages, because among other things the breach damaged WRA's reputation among professional contacts and reduced WRA's opportunities to work with those contacts.

65.    Mr. Miller breached the contract when he violated the Conflicts of Interest clause contained therein, which required "that employees not compromise the company, its customers, partners or suppliers for personal gain" and required employees "to disclose all conflicts of interest to a supervisor." (See Exh. A, p.16–17)

    a.  While employed by WRA, Mr. Miller registered Jive Commerce, LLC, and used Jive Commerce to compete with WRA for personal gain.

    b.  Mr. Miller did not report this conflict of interest to a supervisor.

    c.  While employed by WRA, Mr. Miller helped form JW Cellars, which he used to purchase wine racks and related products from WRA's suppliers and to resell them via Amazon.com and WalkerWineCellars.com to customers who might otherwise have become WRA's customers.

    d.  While employed by WRA, Mr. Miller gained personally from this conflict of interest but did not report it to a supervisor.

    e.  As a direct and proximate of Mr. Miller's breaches of the contract's Conflicts of Interests clause, WRA has suffered damages in an amount to be proven at trial,

including consequential damages, because among other things the breaches amounted to usurping business opportunities and wrongfully profiting at WRA's expense.

66.     Mr. Miller breached the contract when he violated the Non-Solicitation clause contained therein, which forbade a person working for WRA or who had worked for WRA in the past twelve months from soliciting for non-WRA employment other current and former WRA employees with whom the employee worked. (See Exh. A, p.17)

a. While employed by WRA, Mr. Miller solicited non-WRA employment from Mr. Hancock, a WRA employee.

b. While employed by WRA, Mr. Miller solicited non-WRA employment from Ian Campbell, a WRA employee.

c. While employed by WRA, Mr. Miller solicited non-WRA employment from Vince Campbell, a WRA employee.

d. While employed by WRA, Mr. Miller solicited non-WRA employment from Rori Chandler, a WRA employee.

e. While employed by WRA, Mr. Miller solicited non-WRA employment from Jennifer Smith, a WRA employee.

f. Within twelve months of terminating his employment with WRA, Mr. Miller solicited Ms. Lipp, a WRA employee, to work for him.

g. Within twelve months of terminating his employment with WRA, Mr. Miller solicited Mr. Jones, a WRA employee, to work for him.

h. As a direct and proximate of Mr. Miller's breaches of the contract's Non-Solicitation clause, WRA has suffered damages in an amount to be proven at trial,

including consequential damages, because among other things, several of these
employees left WRA as a result of the breaches.

   i.  Further, Mr. Miller's attempts to hire one or more members of WRA's web
development team to work at Jive show that Mr. Miller was attempting to emulate
the "look and feel" of the WRA website, casting doubt on his claim that WRA
copied Jive's website.

67.    Mr. Miller breached the contract when he violated the Competing Employment
clause contained therein, which forbade employees from accepting or performing "work of a
nature that conflicts or competes in any way with" WRA, and which also forbade employees from
"perform[ing] any non-[WRA] work during normal business hours." (See Exh. A, p.17)

   a.  While employed by WRA, Mr. Miller performed work for JW Cellars aka
WalkerWineCellars.com, which competed with WRA.

   b.  While employed by WRA, Mr. Miller performed work for Jive Commerce aka
VinoGrotto.com, which competed with WRA.

   c.  While employed by WRA, Mr. Miller asked Ms. Lipp to punch his time card for
him so that he could work from home on non-WRA projects during normal business
hours.

   d.  As a direct and proximate of Mr. Miller's breaches of the contract's Non-
Solicitation clause, WRA has suffered damages in an amount to be proven at trial,
including consequential damages, because among other things, WRA lost the use
of a resource it was paying for (Mr. Miller's time).

68.    Mr. Miller breached the contract when he violated the Employment of Relatives
clause contained therein, which provided that relatives could only be employed by WRA if, inter

30

alia, they were qualified for the position. (See Exh. A, p.17)

      a.   Mr. Miller fired WRA's long-time warehouse manager, and replaced him with Vince Campbell, who was Ian Campbell's twin brother and who was unqualified and uninterested in running the warehouse.

      b.   As a direct and proximate of Mr. Miller's breaches of the contract's Employment of Relatives clause, WRA has suffered and will continue to suffer damages in an amount to be proven at trial, including consequential damages.

69.    Mr. Miller breached the contract when he violated the Termination Process clause contained therein, which required that "employees return all documents, files, computer equipment, uniforms, company tools, business credit cards, keys and other property on or before the last day of work." (See Exh. A, p.22–23)

      a.   Mr. Miller terminated his employment on March 28, 2014, but did not return the portions of documents from his personnel file that he had improperly removed from company premises earlier.

      b.   Mr. Miller terminated his employment on March 28, 2014, but did not return the portions of documents from Ian Campbell's personnel file that he had improperly removed from company premises earlier.

      c.   Mr. Miller terminated his employment on March 28, 2014, but did not return the portions of documents from Vince Campbell's personnel file that he had improperly removed from company premises earlier.

      d.   Just prior to terminating his employment, Mr. Miller erased all WRA-owned data, work product, and emails from his computer.  Mr. Ogzewalla attempted to restore Mr. Miller's hard drive, but was told by a third-party computer specialist that the

hard drive could not be restored.

e.   As a direct and proximate of Mr. Miller's breaches of the contract's Personnel File clause, WRA has suffered damages in an amount to be proven at trial, including consequential damages, because among other things WRA has had to verify the integrity of all personnel files Mr. Miller may have accessed.

<u>COUNT II – Against Mr. Miller</u>
**(Breach of the Implied Covenant of Good Faith and Fair Dealing)**

70.   Counterclaim Plaintiffs reallege and incorporate by reference paragraphs 1 through 69 of the counterclaim, as if fully set forth at length herein and further allege as follows:

71.   A covenant of good faith and fair dealing arose from the contract at issue. "Every contract includes a covenant of good faith and fair dealing." *Basic Research, LLC v. WooriChemtech Co., Ltd.*, No. 2:13-cv-00509-DN, 2016 WL 1122861, at *5 (D. Utah, Mar. 22, 2016); *Uproar Co. v. Nat'l Broadcasting Co.*, 81 F.2d 373, 377 (1st Cir. 1936) ("[I]n every contract there is an implied covenant that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract, which means that in every contract there exists an implied covenant of good faith and fair dealing.").

72.   Mr. Miller's actions, as described above, were designed to further his own and Jive's interests rather than those of WRA, and Mr. Miller thereby violated the implied covenant of good faith and fair dealing.

73.   As a direct and proximate cause of Mr. Miller's breaches of the implied covenant of good faith and fair dealing, WRA has suffered damages, as described above, in an amount to be proven at trial, including consequential damages.

<u>COUNT III – Against Mr. Miller</u>
**(Breach of Implied Contract / Promissory Estoppel)**

74.     Counterclaim Plaintiffs reallege and incorporate by reference paragraphs 1 through 73 of the counterclaim, as if fully set forth at length herein and further allege as follows:

75.     "[E]ven in the absence of a contract, [a party] may be liable under a theory of promissory estoppel if a plaintiff establishes (1) a promise; (2) that the promise reasonably induced reliance on it; and (3) that the promise relied on the promise to his or her detriment." *Leyden v. American Accreditation Healthcare Comm'n*, 83 F. Supp. 3d 241, 247 (D.D.C. 2015) (holding that the terms of an employee handbook that was not a contract were nonetheless enforceable).

76.     Mr. Miller's actions, as described above, were designed to further his own and Jive's interests and violated his promises to WRA, upon which WRA had reasonably relied to its detriment.

77.     As a direct and proximate cause of Mr. Miller's breaches of the implied contract or promissory estoppel, WRA has suffered damages, as described above, in an amount to be proven at trial, including consequential damages.

### COUNT IV – Against Vino Grotto
### (Unjust Enrichment)

78.     Counterclaim Plaintiffs reallege and incorporate by reference paragraphs 1 through 77 of the counterclaim, as if fully set forth at length herein and further allege as follows:

79.     While employed by WRA, Mr. Miller performed work for Jive Commerce aka VinoGrotto.com, which competed with WRA.

80.     Jive benefitted from Mr. Miller's work when he used his knowledge and expertise to form Jive and begin its business operations.

81.     WRA paid Mr. Miller's salary, unaware that he was performing for Jive rather than WRA despite having clocked in at WRA.

82.     Mr. Miller concealed from WRA the fact that he was using his work hours, paid for by WRA, to benefit Jive, by having his assistant clock him in and out.

83.     Jive, which was essentially Mr. Miller, was aware that it was receiving Mr. Miller's work for free as a result of Mr. Miller's deception.

84.     It would be inequitable for Jive to retain this benefit without paying its value to WRA.

85.     As a direct and proximate cause of Jive's unjust enrichment, WRA has suffered damages in an amount to be proven at trial, including consequential damages.

### **COUNTERCLAIM/THIRD-PARTY COMPLAINT RELIEF REQUESTED**

WHEREFORE, Counterclaim Plaintiffs pray for the following relief:

1.     An award of direct, expectancy, compensatory, and consequential damages in an amount to be proven at trial, including but not limited to compensation for lost business opportunities, usurped business opportunities, lost employees and goodwill, disgorgement of amounts received by Mr. Miller and Jive as a result of Mr. Miller's improper actions, and Jive's unjust enrichment at WRA's expense.

2.     An award of judgment for such further relief as the Court deems just and equitable.

Dated this 24th day of October, 2018.

PIA ANDERSON MOSS HOYT, LLC



Adam Hoyt
Scott Hoyt
William O. Kimball

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that, on October 24, 2018, I caused to be electronically filed the

foregoing **FIRST AMENDED ANSWER TO AMENDED VERIFIED COMPLAINT AND**

**COUNTERCLAIM AND THIRD-PARTY COMPLAINT** with the U.S. District Court,

Central Division of Utah, which will serve notice on all counsel of record registered for CM/ECF

notification.


By: */s/ Michelle Lund*
Paralegal for Pia Anderson Moss Hoyt